## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

TOP JET ENTERPRISES, LTD.,

          Plaintiff / Judgment-Creditor,

             vs.

DAVID KULOWIEC,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)

Case No. 1:21-MC-00789-RA-KHP

Related Case: 1:21-MC-00497-RA-KHP

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES

PILLSBURY WINTHROP SHAW
PITTMAN LLP

Geoffrey Sant
Edward Flanders
Carol Lee
Michelle Ng
31 W. 52nd Street
New York, New York 10019-6131
Telephone.: 212-858-1000
Facsimile: 212-858-1500


Counsel for Plaintiff Top Jet Enterprises, Ltd.

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ...................................................................................................9

    A.   Nature of This Case ................................................................................. 9

    B.   Kulowiec Conceals Ohadi and Woolley's Ownership................................ 10

    C.   Kulowiec's Refusal to Produce Documents Forces Top Jet to Incur Fees ................ 12

    D.   Kulowiec's Deposition Confirms This Court's Ruling that the Searches Were "Halfhearted" and "Ineffective" .......................................... 15

    E.   Kulowiec Produces Documents After the Motion to Compel ................... 16

    F.   Post-Order Conduct Continues to Show this Court Was Correct .............. 17

    G.   Top Jet's Fees Are Appropriate ............................................................. 18

III.  ARGUMENT .....................................................................................................19

    A.   Attorney's Fees, Which Are Mandatory, Are "the Mildest" Form of Sanction ........ 19

    B.   Fees Negotiated and Billed at Arm's Length Are Reasonable ................... 20

    C.   Mr. Schnitzer Should Support Any Assertions As To His Own Fees ........ 23

    D.   Kulowiec's Misconduct and Choices Caused Top Jet's Fees.................... 24

IV.   CONCLUSION....................................................................................................25

## **TABLE OF AUTHORITIES**

**PAGE(S)**

Cases

*A.V.E.L.A., Inc. v. Est. of Monroe*,
No. 12 Civ. 4828 KPF JCF, 2014 WL 715540 (S.D.N.Y. Feb. 24, 2014) ............................19

*Armament, Sys. & Procedures, Inc. v. IQ H.K. Ltd.*,
546 F.Supp.2d 646 (E.D.Wis. 2008)....................................................................................21

*Balcor Real Estate v. Walentas-Phoenix Corp.*,
73 F.3d 150 (7th Cir. 1996) ..........................................................................................20, 24

*Borsanyi v. Huggins*,
No. 17-CV-7266 CBA AKT, 2019 WL 4911188 (E.D.N.Y. Sept. 30, 2019).......................20

*Ceglia v.. Zuckerberg*,
No. 10–CV–00569A (LF), 2012 WL 503810 (W.D.N.Y. Feb. 12, 2012)..............................21

*Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*,
602 F.2d 1062 (2d Cir. 1979)................................................................................................19

*Matter of Cont'l Illinois Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992) ................................................................................................21

*Dickinson Frozen Foods, Inc. v. FPS Food Process Sols. Corp.*,
No. 1:17-CV-00519-DCN, 2021 WL 2444157 (D. Idaho June 15, 2021) ............................22

*Disabled Patriots of Am. v. Niagara Grp. Hotels, LLC*,
No. 07 Civ. 284S, 2008 WL 941712 (W.D.N.Y. Apr.4, 2008) .............................................19

*Farmers Co-op Co. v. Senske & Son Transfer Co.*,
572 F.3d 492 (8th Cir. 2009) ................................................................................................24

*Fendi Adele v. Filene's Basement Inc.*,
No. 06 Civ. 244 RMB MHD, 2009 WL 855955 (S.D.N.Y. Mar. 24, 2009) .........................19

*First Fed. Sav. & Loan Ass'n of Rochester v. United States*,
88 Fed. Cl. 572 (2009) ..........................................................................................................22

*Fla. Rock Indus. v. United States*,
9 Cl.Ct. 285 (1985) ...............................................................................................................22

*Fox v. Vice*,
563 U.S. 826 (2011)..........................................................................................................21, 22

ii

*In re GMC*,
110 F.3d 1003 (4th Cir. 1997) ...........................................................................24

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ...........................................................................................22

*Hindman LLC v. Mihaly*,
2021 WL 5362255 (S.D.N.Y. Oct. 22, 2021) ........................................................8

*Matthews v. Wis. Energy Corp.*,
642 F.3d 565 (7th Cir. 2011) ..............................................................................20

*On Time Aviation, Inc. v. Bombardier Capital, Inc.*,
354 F. App'x 448 (2d Cir. 2009) ..........................................................................21

*In re: Terrorist Attacks*,
No. 03MDL1570GBDFM, 2015 WL 9255560 (S.D.N.Y. Dec. 18, 2015) ...............9

*In re Terrorist Attacks on Sept. 11, 2001*,
No. 03 MDL 1570 GBD FM, 2015 WL 6666703 (S.D.N.Y. Oct. 28, 2015) ......9, 21

*Tse v. UBS Fin. Servs., Inc.*,
568 F. Supp. 2d 274 (S.D.N.Y. 2008) ..................................................................20

*Underdog Trucking, L.L.C. v. Verizon Servs. Corp.*,
273 F.R.D. 372 (S.D.N.Y. 2011) (Cott, J.) ..............................................8, 19, 20

*Wager v. G4S Secure Integration, LLC*,
2021 WL 4434953 (S.D.N.Y. Sept. 24, 2021) ......................................................20

<u>Rules and Regulations</u>

Federal Rules of Civil Procedure
Rule 37 .................................................................................................... *passim*
Rule 45 ................................................................................................................8, 9

<u>Other Authorities</u>

8B Wright & Miller, Federal Practice and Procedure
Section 2288 (3d ed. 2010) .................................................................................20

7 James Wm. Moore, Moore's Federal Practice
Section 37.23 (3d ed. 2008) ...............................................................................19

## I.     **INTRODUCTION**

Pursuant to this Court's January 31, 2022 Order (Dkt. No. 39) ("Jan. 31 Order"), and Fed. R. Civ. P. 37(a)(5), Plaintiff Top Jet Enterprises, Ltd. ("Top Jet") respectfully submits these suggestions in support of its motion for an award of fees, costs, and interest running from the date of each invoice. Because this Court has ordered there be no Reply brief, Top Jet anticipates arguments such as those made by Kulowiec's clients in their Eighth Circuit appeal from the Missouri District Court's Order for attorney's fees in *Jet Midwest Int'l Co. Ltd. v. Jet Midwest Group, LLC et al*., Case No. 18-cv-06019-FJG (W.D.Mo.) (the "Fraudulent Transfer Action").

Top Jet issued its subpoena, and later brought this motion to compel and for sanctions, to determine the owners of Kulowiec's client (Skyblueocean Ltd. ("Sky")), which owes Top Jet over $100 million in final, non-appealable judgments after interest. *See* Jan. 31 Order at 1-2. Top Jet suspected that Ohadi and Woolley partially own Sky, just as they partially own JMG (itself a partial owner of Sky). In 2020, a federal court found that, contrary to their denials, Ohadi and Woolley own JMG, and therefore found them liable for $41 million in fraudulent transfers. *See* Ex. 2 ("Aug. 6 Order").[1] As this Court noted, "Sky has denied that Ohadi and Woolley are owners of Sky as well, notwithstanding documents showing otherwise obtained by Plaintiff in the Fraudulent Transfer Action." *See* Jan. 31 Order at 1-2 n.1.

Top Jet also sought information about how an allegedly insolvent Sky—which has failed to pay any portion of the judgment against it—was nevertheless able to pay for legal counsel (Forbes Hare) in the Cayman Islands to oppose efforts at enforcing the judgment.

As set forth in this Court's January 31 Order, Kulowiec has spent ten months concealing and delaying production of documents. This Court "found Defendant had not fully or correctly conducted the search" (Jan. 31 Order at 9-10), "failed to search other files and admitted to missing documents" (*id*., 3), and "it is clear Defendant caused the instant dispute" (*id.*, 10). This Court described Kulowiec's "non-compliance with the subpoena" (*id*., 2); "lateness in

---

[1] Citations to "Ex. __" refer to exhibits to the Declaration of Carol Lee ("Lee Dec."), dated February 11, 2022, in support of this Motion.

responding to the subpoena" (*id.*, 6); "failures to appreciate how to conduct an appropriate search" (*id.*); "withholding of documents as privileged and then withdrawing privilege assertions" (*id.*); and "failure to produce full email chains that should exist based on what was produced" (*id.*). Kulowiec's discovery efforts were "halfhearted," "ineffective," and "a game." (*Id.*, 10). "Defendant's initial search was clearly inadequate, as it did not involve search of all sources of relevant documents or search terms reasonably designed to locate relevant documents." (*Id.*) Kulowiec intentionally used search terms that were designed to fail "when there were other search terms he could have used to find responsive documents." (*Id.*) Kulowiec "further exacerbated the issues by withholding documents that were not privileged." (*Id.*)

This Court found any privilege over documents relating to JMG and Sky was waived, and ordered Kulowiec to produce 38,774 documents that he had been withholding. Jan. 31 Order at 13. While Top Jet has only begun reviewing these documents, it is already clear why Kulowiec fought so hard to conceal and block production of documents relating to Ohadi and Woolley's ownership. The documents show that, from day one, Kulowiec directly participated in JMG's decision to conspire with Ohadi and Woolley and lie about their ownership of JMG.

During the January 5, 2022 Hearing, Top Jet's counsel highlighted a "smoking gun" email from 2017, produced after the motion to compel briefing was completed, in which Kulowiec wrote: "Was a final decision made for the equity ownership of Sky? It would be preferable if Jet Midwest Group LLC had some equity piece for litigation purpose. Please let me know ASAP." *See* Ex. 3 at 13:19-14:7. As Top Jet argued: "There's no legitimate reason why the ownership of Sky should be decided two years after it was formed or why Mr. Kulowiec would suggest an ownership structure for litigation purpose." *Id.*

Kulowiec's post-hearing briefing (filed without leave of court) claimed that the only response to this email was an email from Ed Grigorian (an outside accountant), stating (in its entirety): "Please give me a call on my cell phone to discuss." Jan. 6, 2022 Brief (Dkt. No. 33). Top Jet responded that it was not credible to claim this was the sole response.

Top Jet was right. Indeed, the "final decision" email was part of the plot to change the

corporate structures of JMG and Sky to evade creditors. In a newly produced December 19, 2017 email to Kulowiec and others, JMG representatives stated: "We have been meeting . . . on *various corporate structure* strategic and planning issues and *discussing the various impacts when considering the Chinese litigation*. If we intend to *make some changes* we need to do so in short order…" Ex. 4 at Kulowiec204120-204121 (emphasis added).

On February 8, 2018—just weeks before JMG's 2018 bankruptcy filing—counsel to Ohadi wrote to JMG's litigation team stating: "We have taken the liberty of preparing the attached draft affidavit and ask that you present it to your client for execution. The purpose of the affidavit, as you will discover, is to establish that [Ohadi and Woolley] are not and have not been members of the Company [and] are not properly classified as insiders." Ex. 4 at Kulowiec210648. The affidavit was written in the voice of Mike Logan, CFO for JMG (not represented by counsel for Ohadi and Woolley). JMG's litigation counsel circulated this email to Kulowiec and others, together with a cover note. The cover note reviews evidence that Ohadi and Woolley became owners of JMG, including "an executed 'Amendment No. 2 to Operating Agreement of Jet Midwest Group LLC'" making Ohadi a member of JMG, as well as "a letter from Dave Kulowiec," "apparently sent to the Chinese on May 16, 2016," stating that Ohadi and Woolley are owners of JMG. *Id.* at Kulowiec210527-210529. "The affidavit as written suggests the way to resolve these discrepancies is that, at one time, the parties contemplated ownership for Ohadi and Woolley but that was never consummated." *Id.*

In response to this proposal, the lead litigation partner for JMG wrote back to the group— all bolding and capitalization in original—to warn that this course of action will "**create a fraud claim**," adding: "**I would think twice before executing an affidavit with**[out] **making a complete analysis of WHY THE AMENDMENT WAS EXECUTED ON 8/14/15 and why Dave K**[ulowiec] **wrote his letter**." Ex. 4 at Kulowiec210651-210653.

Two weeks later, Kulowiec wrote to JMG's owners: "One issue that we need to resolve in connection with both the resolutions and the bankruptcy filing documents is the ownership of JMG." Ex. 4 at Kulowiec212140.

Around that time, JMG replaced its original litigation counsel (which had warned about creating "**a fraud claim**") with Polsinelli, which prepared and filed JMG's bankruptcy filing. In that filing, JMG falsely stated that it was owned 99% by Karen Kraus and 1% by Paul Kraus.

On March 19, 2018 (nearly one month after JMG's bankruptcy filing), JMG's bankruptcy counsel apparently learned from Kulowiec that Ohadi and Woolley are also owners of JMG. JMG's bankruptcy litigation counsel wrote privately to Kulowiec to request "the correct corporate owners and percentages so that we can prepare a revised list of equity securities holders for filing with the Bankruptcy Court." Ex. 4 at Kulowiec218294-218295.

Kulowiec responded, in another secret communication, "there is strong evidence that the F. Paul Ohadi Trust . . . holds a 20% ownership interest in JMG" and "the only reason" Ohadi is denying ownership "is that it is afraid it will be deemed an insider or affiliate and this will result in the loss of [Ohadi's] priority with respect to the JMG assets." Ex. 4 at Kulowiec218835-Kulowiec218839. Kulowiec discusses what would happen "if [Ohadi] acknowledges the ownership interest," and requests an "explanation as to what would happen to the [Ohadi] Trust's priority in the JMG assets if it admits that it holds a 20% interest in JMG." (*Id.*) JMG's bankruptcy counsel initially urges the group to acknowledge Ohadi and Woolley's ownership, stating, "their ownership would have no effect on the priority of their claims." *Id.* at Kulowiec218642-218644.

But, after receiving pushback, JMG's counsel decides that JMG should continue lying about its ownership since its executives had already given false testimony: "I think the question that the company needs to decide is does the benefit of changing the company's ownership in the bankruptcy case outweigh the risk of doing so. From a litigation point of view, the change will be difficult to overcome, especially since both Mike Logan and Karen have testified in support of the current disclosed ownership structure." Ex. 4 at Kulowiec218835-218839.

All of this confirms that Top Jet's counsel was correct in stating, at the January 5, 2022 Hearing: "[W]hat is going on here is Mr. Kulowiec produced the documents he did in December in order to convince this Court that he's done enough so that he can shield other documents that

show his own role in fraudulently changing the ownership structure of his client." Ex. 3 at 14:14-25. This is exactly what the newly produced documents show. While Kulowiec produced some documents stating that Ohadi and Woolley own JMG, he continued concealing documents showing *his own role in fraudulently concealing their ownership*.

None of the documents quoted above were produced or logged by Kulowiec, whether in response to the 2018 subpoena or in response to the 2021 subpoena. None of the documents were privileged, given that they directly discuss defrauding creditors. With the exception of one document (Ex. 4 at Kulowiec218835-218839), which was obtained in redacted form during the Fraudulent Transfer Action, *all* of these documents were uncovered for the first time in 2022 after this Court's January 31 Order required production of the 38,774 documents.

From the beginning, Kulowiec directly participated in JMG's plot to falsely claim that Ohadi and Woolley were not owners—and did so despite knowing this will "**create a fraud claim.**" This is why Kulowiec refused to conduct a proper search, and this is why he has spent nearly a year fighting this discovery dispute.

Top Jet has vigorously pursued discovery into Ohadi and Woolley's ownership of Sky (including indirect ownership through JMG) because there is an unpaid, final and non-appealable judgment of over $100 million against Sky after interest. Top Jet wants to avoid repeating the massive delays and legal expense caused by Kulowiec's noncompliance with the 2018 subpoena.

Kulowiec's failure to produce critical evidence in response to the 2018 subpoena regarding JMG's ownership caused a *half-decade* of *ongoing* litigation and *tens of millions* in legal fees. In particular, Ohadi and Woolley are currently appealing the merits ruling in the Fraudulent Transfer Action, arguing to the Eighth Circuit that there is insufficient evidence they own JMG. *As of 2019*, JMG had already spent "millions and millions of dollars" on fees in these disputes. Ex. 5 at 497:14-23; 505:16-18 (JMG's CEO testifying that JMG spent "four million to five million dollars" as of 2019). JMG's total fees as of 2022 is unknown. Top Jet's affiliate won a fee award of over $6.5 million at the end of the Fraudulent Transfer Action. Ohadi and Woolley's fees are additional unknown millions.

Top Jet seeks the fees that it actually incurred and was billed in this action: $916,848.81. This is less than 1% of Top Jet's judgment. Indeed, during the ten months that Kulowiec has delayed production of responsive documents, Top Jet's judgment has accumulated approximately $4 million in interest—over four times the amount sought here. Yet, to date, Top Jet has been able to collect only $4,017.42. Given the size of the judgment and the importance of the concealed documents, Top Jet's fees are reasonable. The amounts at stake include:

- $31 million in inventory that Kulowiec's clients concealed in the "fraudulent transfer" litigation in Missouri (Aug. 6 Order FF ¶¶ 304-316, 416-417, 420-441);

- $41 million in cash and share certificates that Kulowiec's clients fraudulently transferred (*id*.); *see also* Jan. 31 Order at n.1;

- $6,575,833.37 plus 14% interest in the 2017 "term loan" litigation in Missouri, which related party JM International won on summary judgment (Ex. 7);

- $823,341.04 plus 14% interest in attorney's fees for the "term loan" litigation (*id*.);

- "a failed $100 million joint venture between a subsidiary of the Debtor [JMG] and Top Jet to purchase used aircraft, aircraft engines, and aircraft parts and recondition them for re-sale to third parties" (Ex. 8);

- $76,043,750 from the Hong Kong arbitration award "with compound interest of 15% per year from 30 June 2019 through the date of this award" and "4.25% commencing on the day following the date of this award . . . until full payment" – amounting to roughly $100 million as of January 31, 2022 (Ex. 1 at §25; *see also* Ex. 9 (Grand Court of the Cayman Islands confirming an award of "US$87,231,250… together with simple interest thereon from 23 June 2020 to the date of payment at the rate of 4.25% per annum")); and

- $2,319,518.73 plus "simple interest at the annual rate of 4.25% from December 24, 2020" in attorney's fees and costs from the Hong Kong arbitration (Ex. 10).

Top Jet's fees are in line with the numbers presented by Kulowiec's counsel, which claimed that merely *reviewing* the documents at issue would cost $500,000. *See* Jan. 31 Order at 5. Kulowiec's estimate excluded fees incurred in motion practice, hearings, meet-and-confers, letters, Kulowiec's deposition, and for investigating the gaps in Kulowiec's productions.

Top Jet's fees are proportionate to those paid by Kulowiec's clients, JMG and Sky. JMG

has been paying the Polsinelli firm $60,000 to $80,000/month. *See Top Jet Enterprises, Ltd. v. Sino Jet Holding Ltd. et al.*, 20-cv-00532-FJG (W.D. Mo.) ("Confirmation Proceeding"), Dkt. 120 at 19. During the Fraudulent Transfer Action, JMG admitted its payments and debts to Kulowiec for 2017 alone exceeded half a million dollars. *See* Ex. 25 at JMG_TRO001616-1617.

Moreover, earlier this year, Kulowiec's client, JMG, began sending the contents of its California Wells Fargo account ($467,759.74) out-of-state to litigation counsel (Polsinelli) *the day after* Top Jet registered a judgment in California. *See* Confirmation Proceeding, Dkt. Nos. 119 at 2; 122 at 8; 122-4 at 2-4. Even if one assumes this is not a fraudulent transfer, the size of this transfer demonstrates that Top Jet's total amount of fees for the past ten months are reasonable.

As it turns out, however, an email from JMG to Kulowiec reveals that JMG was intentionally dissipating its funds to preferred recipients to prevent legitimate creditors from seizing those funds. At the same time JMG was transferring half a million dollars to Polsinelli to evade garnishment, JMG wrote to Kulowiec: "Hi Dave…I forgot to mention that I think we need a bill from you for 2020. I can't see anything in the system, but I believe we have some funds to distribute if we have an open balance with you. Please advise on that ASAP and feel free to call me to discuss, thanks!" *See* Ex. 4 at Kulowiec318129-318145.

Kulowiec caused all Top Jet's fees by stonewalling and concealing documents during discovery. Rather than complying with his discovery obligations as an officer of the court, Kulowiec claimed at the August 11, 2021 hearing that the 22 documents he had produced was "all there is." *See* Ex. 23 at 23:17-25.  In fact, he was withholding 99.95% of the documents that he would eventually produce as admittedly responsive. By the time of this Court's Jan. 31 Order, Kulowiec had withheld documents for 269 days—over 19 times longer than the 14 days provided

by Rule 45.

Kulowiec's stonewalling and non-compliance forced Top Jet to file a motion to compel. Only then did Kulowiec produce more documents—while still concealing emails revealing his own central role in initiating the frauds about Ohadi and Woolley's ownership.

Given Kulowiec's production of documents after the motion to compel was filed, sanctions in the form of "an award of reasonable expenses and attorney's fees is mandatory under Rule 37(a)(5)(A)." Jan. 31 Order at 12 (citing *Hindman LLC v. Mihaly*, 2021 WL 5362255, at *2 (S.D.N.Y. Oct. 22, 2021)).

Top Jet should receive 100% of its fees beginning from the time Sky directed Top Jet to subpoena Kulowiec because:

- Top Jet received 100% of the relief it requested;

- Kulowiec can seek contribution from his clients;

- Rule 37 makes payment of attorney's fees mandatory;

- Putting Top Jet back into its original financial position by reimbursing attorney's fees is "the mildest" form of sanction (*Underdog Trucking, L.L.C. v. Verizon Servs. Corp.*, 273 F.R.D. 372, 379 (S.D.N.Y. 2011) (Cott, J.));

- Courts hold that fees negotiated at arm's length in the open market are presumptively reasonable; and

- Kulowiec's misconduct caused all these fees.

Moreover, Kulowiec's clients, Sky and JMG, caused these fees when they disclaimed possession of the documents. Recognizing this, this Court ruled that Kulowiec can seek contribution from them, "as this entire action was brought about solely by their failure to comply with discovery sought by Top Jet and failure to pay a judgment." Jan. 31 Order at 12-13.[2]

---

[2] For its part, JMG is subject to an "uncompromising," "sweeping," and "categorical" fee-shifting provision for attorney's fees relating to the underlying agreements. *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Group, LLC*, 932 F.3d 1102, 1106 (8th Cir. 2019).

Because this motion only seeks to financially return Top Jet to its status quo ante, and does not seek punitive sanctions, Top Jet respectfully requests it be granted in its entirety. *Cf* Jan. 31 Order at 7 ("Rule 45 provides that a responding party may be held in contempt for noncompliance, and Rule 37 provides that a party may request sanctions for noncompliance."); *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 GBD FM, 2015 WL 6666703, at *4 (S.D.N.Y. Oct. 28, 2015), *report and recommendation adopted sub nom*. *In re: Terrorist Attacks*, No. 03MDL1570GBDFM, 2015 WL 9255560 (S.D.N.Y. Dec. 18, 2015) (seeking 150% of fees under Rule 37 "to further the goals of specific and general deterrence").

## II.    BACKGROUND

### A.    Nature of This Case

On June 22, 2020, an arbitral tribunal unanimously awarded Top Jet damages of $87 million, plus interest, against JMG, Sky, and Sino Jet, jointly and severally, as well as fees and costs of $2.2 million. *See* Ex. 1, ¶¶ 25.3-25.4; Ex. 10, ¶ 22.1. The tribunal found "it is clear" that JMG and Sky "did not act in good faith." Ex. 1, ¶ 19.15. On Jan. 25, 2021, the Missouri District Court confirmed the award. *See* Confirmation Proceeding, Dkt. Nos. 49, 50. To date, Top Jet has collected just $4,017.42, and the judgment has grown to $100 million. Neither Sky nor JMG voluntarily pay anything.

Sky claimed that documents held by its attorney, Kulowiec, were not in its possession, custody or control, and that Top Jet must subpoena Kulowiec. Top Jet subpoenaed Kulowiec in April 2021, seeking Sky's ownership information in order to explore veil-piercing and other collection mechanisms given that Sky claims to be insolvent and JMG is in bankruptcy. *See* Ex. 11. Top Jet pursued discovery from Kulowiec for ten months, as compared to the seven months to confirm the arbitration award itself over Sky's opposition.

On June 25, 2021, Top Jet registered the judgment in the Related Action. *See* Related Action, Dkt. Nos. 1-3; *see also* Jan. 31 Order at 1.

**B.**    **Kulowiec Conceals Ohadi and Woolley's Ownership**

A federal court found that, in 2018, Kulowiec's client JMG and its owners defrauded creditors and the U.S. Bankruptcy Court in Delaware by falsely denying that Ohadi and Woolley own JMG. *See* Aug. 6 Order, FOF ¶¶ 58-63. This was done so JMG could fraudulently transfer assets to its owners. *Id.*; *see also* Fraudulent Transfer Action, Dkt. No. 761 at 10-11 ("JMG along with [its owners] engaged in numerous fraudulent actions and transfers," including "concealment of inventory during post-judgment discovery, and concealment of inventory from the bankruptcy court"). Kulowiec concealed JMG's fraud from the bankruptcy court while seeking to act as its counsel. *See In re Jet Midwest Group, LLC,* Bankr. D. Del. Case No. 18-10395 (KJC), Dkt. No. 99.

In 2018, Top Jet's affiliate subpoenaed Kulowiec about Kulowiec's written "Confirmation" (sent to that affiliate) that Ohadi and Woolley own JMG. As he did here, Kulowiec evaded and violated that 2018 subpoena. The history of Kulowiec's noncompliance is set out in contemporaneous emails:

> We did not receive any documents from you yesterday, or any other communication from you yesterday. We attempted to call you several times yesterday evening, but your phone was disconnected. We also have not received a call, an email, or any documents from you… The subpoena duces tecum was returnable today (May 8), but nothing was produced, and no calls or emails have been received from Dave or anyone at his office.

Ex. 4 at Kulowiec223221-223226.

In response to the 2018 subpoena, Kulowiec eventually produced nine documents. Kulowiec concealed nearly every document about Ohadi and Woolley's ownership of JMG. During Kulowiec's Sept. 27, 2021 deposition, Kulowiec was confronted with emails produced

for the first time in 2021. Kulowiec admitted that each one shows "Ohadi and Woolley are owners," and should have been produced in 2018. Lee Dec. __, Ex. 4 at 98:21-113:15.

Among the many documents Kulowiec failed to produce in 2018 include:

(1) A JMG email to Woolley and Kulowiec: "F. Paul Ohadi Trust and Kenneth M. Woolley being members holding 10% interest in Jet Midwest Group, LLC." *See* Ex. 4 at Kulowiec004698-4703.

(2) An email from Helsten (personal counsel to Ohadi and Woolley) stating: "Paul Ohadi is looking for stock certificates and membership interests asap." *Id.* at Kulowiec008800.

(3) An email from JMG's CEO to Helsten, Woolley and Ohadi: "Paul [Ohadi] and Ken [Woolley]: We finally closed! . . . . We are blessed to have you two as partners in Jet Midwest [Group] and Dynamic." *Id.* at Kulowiec003994.

(4) A Helsten email stating "Ken [Woolley] asked me to reach out to you . . . to discuss the Ohadi loan and his ownership in JMW [*i.e.*, Jet Midwest Group]." *Id.* at Kulowiec012014.

During the Fraudulent Transfer Action, Top Jet's affiliate obtained from other sources emails sent by Kulowiec to JMG asking "what would happen to the [Ohadi T]rust priority in the JMG assets if it admits that it holds a 20 percent interest in JMG." *See* Ex. 13 at 92:6-94:25. When deposed about his own emails, Kulowiec refused to answer, claiming emails about his client's frauds were privileged. *Id.* at 85:1-94:25.

Likewise, in the present dispute, Kulowiec "further exacerbated the issues by withholding documents that were not privileged." Jan. 31 Order at 10. "This Court should not have had to give Defendant—a lawyer—a tutorial on what constitutes a privileged communication." *Id*. The newly produced emails reveal that Kulowiec and JMG have strategically used false claims of privilege to conceal key evidence. As stated in an email exchange between JMG's litigation counsel and Kulowiec:

We have noticed numerous communications between or among Dave [Kulowiec]'s firm and [JMG] which frankly are not helpful to our case and might actually be detrimental. If we do not produce them or identify them because Dave and/or Jeff were on the emails, then [the plaintiff] can't press to have them []

produced and *they will not know that such evidence exists*.

Ex. 4 at Kulowiec191709-191713 (emphasis added).

### C.    Kulowiec's Refusal to Produce Documents Forces Top Jet to Incur Fees

The Subpoena's return date was May 7, 2021. But on May 7, Kulowiec produced nothing. Kulowiec strung Top Jet along for months with fake promises and nonsense excuses. Kulowiec obtained extensions of time to produce documents to May 21, 2021 and then May 28, 2021, but did not produce anything at these times. "On June 1, 2021, Defendant produced a total of 22 responsive documents, none of which set forth Sky's ownership." Jan. 31 Order at 2.

In response to this obviously deficient production, Top Jet wrote and left voice messages for Kulowiec on June 2, June 4, and June 11. Kulowiec did not respond. On June 14, Kulowiec answered his phone and admitted to withholding documents, but refused to create a log. He promised that he would follow up with Top Jet, but he never did. *See* Related Action, Dkt. No. 4.

On June 29, 2021, Top Jet sought a pre-motion conference pursuant to Local Rule 37.2. *Id.* Two days later, Mr. Schnitzer, representing Kulowiec, emailed Top Jet that he was working "with Kulowiec to put together a privilege log, and hope to have it complete by end of next week (the 9th)." Ex. 14. But Kulowiec did not produce a log on July 9 or any time in July.

During the August 11, 2021 conference, "[i]n response to questioning about how many documents had been reviewed to locate the less than 50 produced and/or logged, Defendant's counsel Edward Schnitzer represented that Defendant had reviewed thousands of e-mails." Jan. 31 Order at 3. Kulowiec also admitted to representing Sky since 2015 and representing JMG "for a long time," "maybe ten years." *See* Ex. 12 at 12:15-18. During the Fraudulent Transfer Action, JMG revealed it had paid Kulowiec over half a million dollars in a single year. *See* Ex. 25 at JMG_TRO001616-1617.

Given this background, it was not credible that Kulowiec had fewer than 50 documents reflecting the ownership of Sky and JMG. Yet Kulowiec insisted the 22 produced documents was "all there is." Ex. 23 at 23:25. During the August 11 conference, Mr. Schnitzer falsely claimed he and Kulowiec had searched Kulowiec's emails together: "*We* narrowed it down to the emails that were responsive and then reviewed those. . . . But, of course, I do understand your instruction, and *I will go through with Mr. Kulowiec again*, just to make sure." *Id.* at 35:23-36:10. In fact, Mr. Schnitzer had neither seen nor searched Kulowiec's emails.

As this Court stated, "I ordered Defendant's counsel to conduct a follow-up search and make an affirmative representation that there were no more documents responsive to Plaintiff's subpoena." Jan. 31 Order at 3. Thereafter, on August 26, Kulowiec produced some improperly logged documents, including a handwritten "Joint Venture Structure" chart showing Ohadi owns 20% of Sky. *Id.* at 4. At 11:38 pm, the night before the September 9, 2021 court hearing, Kulowiec produced four more emails (and two attachments) he claimed "were just located." Ex. 6. All were responsive to both the 2018 and 2021 subpoenas. These included "an organizational chart showing Ohadi and Woolley had an ownership interest in both Sky (3% each) and JMG (10% each)." Jan. 31 Order at 4.

At the September 9, 2021 conference, Mr. Schnitzer made an affirmative representation that "Mr. Kulowiec has produced all that he had"; "[t]he search has been completed"; and "there is nothing more." Jan. 31 Order at 4. In fact, however, "Mr. Schnitzer did not independently review the thousands of e-mails identified as potentially relevant by Defendant." *Id*. At the time of this representation, Kulowiec had produced just 61 documents and was withholding 1,650 documents he would eventually produce as admittedly responsive.

This Court granted leave to file this motion to compel and for sanctions. *See* Jan. 31

Order at 4; 9/9/2021 Hr. Tr. at 24:14-21; 25:12-14; 32:12-16.

However, rather than move immediately to compel and for sanctions, Top Jet *twice* obtained extensions of time from this Court to file that motion while Top Jet engaged in negotiations to resolve the discovery impasse. *See* Related Action, Dkt. Nos. 37, 43.

"Plaintiff offered to conduct a review of all documents pursuant to a 'clawback' or 'quick peek' agreement." Jan. 31 Order at 5. Both options would shift all cost to Top Jet. In the Jan. 31 Order, this Court ordered Kulowiec to produce all requested documents subject to a protective order that allows documents to be clawed back if they are irrelevant and implicate a separate client's privileges. This is what Top Jet was offering to do all along.

Kulowiec chose to play "games in responding to the subpoenas." Jan. 31 Order at 6-7; *see also id.* at 8, 10 (discovery obligations are not "a game"). Thus, this motion seeks attorney's fees for the meet-and-confer process, which Kulowiec did not take seriously. *See id.* at 9-10 ("each time the Court found Defendant had not fully or correctly conducted the search and directed Defendant to go back... more responsive documents were located").

On Sept. 19, one day before the requested production deadline, Mr. Schnitzer announced he had run the searches but would not review anything unless Top Jet paid "all costs, including search, collection, hosting, and production" as well as Mr. Schnitzer's fees, purportedly totaling over $500,000. Ex. 15 at 6. On Sept. 27, less than two hours before Kulowiec's deposition, Mr. Schnitzer submitted a letter to the Court, alleging that he "informed Top Jet" its terms were too broad, but Top Jet "refused to remove any search terms." *See* Related Action, Dkt. No. 35. Mr. Schnitzer did not reveal that he had demanded "Top Jet must agree to pay all costs" before he would *discuss* search terms. *See* Ex. 15 at 6 n.1. On this and other occasions, Top Jet had to assemble the real facts and disprove the misinformation.

14

Doing the best it could in the face of Kulowiec's "non-compliance" (Jan. 31 Order at 2), Top Jet narrowed the potentially responsive documents by 40% (to 38,774) by agreeing to restrict the timeframe and search terms. *See* Ex. 16. Top Jet proposed prioritizing a review of emails containing Ohadi and Woolley's first and last names. *Id.*

Mr. Schnitzer not only rejected any prioritized review, he refused to *even run a search* to find out how many documents there were "unless you/your client is paying the cost." *See* Ex. 17. As to a clawback agreement, Kulowiec demanded that Top Jet's counsel first "agree, on behalf of your firm and all clients in this matter, that you will not contact Mr. Kulowiec or his firm ever again, in any way, any proceeding whether it be subpoena or notice of deposition." *Id.* These demands made a negotiated solution impossible. Top Jet had to file this motion to compel.

### D.   Kulowiec's Deposition Confirms This Court's Ruling that the Searches Were "Halfhearted" and "Ineffective"

Kulowiec's deposition took place weeks after Kulowiec's counsel affirmatively represented that "Kulowiec has produced all that he had." But when asked at his deposition if this was true, Kulowiec answered: "I don't know." *See* Ex. 12 at 55:19-24.

Kulowiec testified that "the only thing" he did "to comply with the subpoena [was] to search for emails using the keyword 'Skyblueocean.'" *See* Ex. 12 at 39:2-11; 48:9-10; 57:8-19; 59:11-22. Allegedly, this is why he only found 22 responsive, nonprivileged emails. But of the 521 responsive emails that Kulowiec belatedly produced in December 2021, *332* contained the keyword "Skyblueocean." *See* Ex. 3 at 8:11-9:6. Thus, either Kulowiec's sworn testimony about doing the search was false, or he intentionally concealed most of the responsive documents he found. In any case, "Skyblueocean" was a "clearly inadequate" search term. Jan. 31 Order at 10.

When pressed on why he didn't comply with discovery, Kulowiec testified that he chose to "work for clients for which I'm getting compensated." *See* Ex. 12 at 52:12-15. He "did not

talk to anyone at my firm to ensure the documents are preserved . . . or produced" and he "deleted voice mails." *Id.* at 79:4-7, 24:24-25, 35:16-20; 39:21-40:9; 60:3-4.

Kulowiec admitted he did not produce notes, only looked through one file, and he "should have" produced emails that "show whether Ohadi and Woolley are owners of JMG." *Id.* at 37:3-6, 69:4-5, 100:12-13, 113:8-15; *see also id.* at 112:3-12 ("[Y]eah… it has relevance... it was being discussed"); 107:2-11 ("I don't know" why the emails were not produced in 2018).

### E.    Kulowiec Produces Documents After the Motion to Compel

Eventually, in September, and then in December—after the Motion to Compel was fully briefed—Kulowiec produced 1,650 documents. This is 70 times greater than Kulowiec's initial 22-email production. This Court held: "Defendant provided much of the contemplated discovery after the motion to compel was filed and fully briefed. Accordingly, an award of reasonable expenses and attorney's fees is mandatory under Rule 37(a)(5)(a)." Jan. 31 Order at 12.

Throughout this time, Kulowiec continued his pattern of deluging the Court with unrequested, overlength letters and briefs. *See* Dkt. Nos. 25, 29, 30, 33. Responding to these unrequested, unpermitted, and overlength submissions directly caused much of Top Jet's expense. If Kulowiec was willing to force Top Jet to incur the expense of responding to these filings, he must also be willing to pay for them himself.

Indeed, an email exchange between JMG, its litigation attorneys, and Kulowiec *repeatedly* describe their strategy in opposing creditors as: "Make them spend money." *See* Ex. 4 at Kulowiec 185751. For example, JMG expressly schemed to force creditors to file papers first and *then* agree to a stipulated order later: "[W]e agree with [this] approach. Make them spend the money; put their papers in; we can discuss implementing order after." *Id.*

Kulowiec also dramatically increased expenses by making productions in dribs-and-drabs. Top Jet had to continuously cross-check productions to identify gaps, such as the "failure to produce full email chains that should exist based on what was produced." Jan. 31 Order at 6.

F. <u>**Post-Order Conduct Continues to Show this Court Was Correct**</u>

On February 1, 2022, immediately after this Court ordered production of 38,774 documents, Mr. Schnitzer informed Top Jet's counsel that 136 of these documents were emails between Mr. Schnitzer and Kulowiec. Mr. Schnitzer sought Top Jet's agreement that he could withhold these documents notwithstanding the Court's January 31 Order. On February 3, Mr. Schnitzer informed Top Jet that in fact there were 193 such emails.

Top Jet has not demanded these 193 emails because it is not interested in obtaining Mr. Schnitzer's legal counsel to Kulowiec. Top Jet's sole concern is whether all of these *are in fact* genuine legal advice, or whether this is another attempt at using privilege to conceal key evidence. *See* Ex. 4 at Kulowiec191712 (stating, "If we do not have to produce them or identify them because [attorneys] were on the emails, then [the plaintiff] can't press to have them [] produced and they will not know that such evidence exists"). Top Jet is currently reviewing the produced documents to determine whether it has concerns about these withheld documents.

In any case, if Mr. Schnitzer's own emails slipped through review *193 separate times*, this indicates Kulowiec's review was indeed "halfhearted," "ineffective," and "inadequate," and the Court was correct to have "concerns that the review may not have been complete given all of the problems with the review thus far." *See* Jan. 31 Order at 10-11.

So far, Top Jet's counsel has reviewed approximately 2% of Kulowiec's production. It is already clear that Kulowiec failed to produce or log (1) ownership-related documents, such as Ex. 4 at Kulowiec079162-079167 (12/5/2016 email from Kulowiec stating: "Here is a copy of the structure chart for the joint venture" and attaching a chart showing Ohadi owns 20% of Sky); and (2) documents regarding the payments to Forbes Hare, such as *id.* at Kulowiec323042-323053; Kulowiec323208.

Moreover, as discussed above, Kulowiec failed to produce documents showing his own involvement in fraudulently concealing Ohadi and Woolley's ownership of JMG. One early email warned—in bold and all caps—that if JMG denied Ohadi and Woolley's ownership, this will "**create a fraud claim**" and that everyone should "**think twice**" about "**WHY THE**

**AMENDMENT WAS EXECUTED ON 8/14/15 and why Dave K wrote his letter**." *See* Ex. 4 at Kulowiec210651. None of the emails and documents relating to Kulowiec's own involvement in the fraudulent concealment of JMG's owners were produced or logged.

Finally, Kulowiec repeatedly told this Court he was a disinterested third party, but emails show that Forbes Hare was "authorised by [Sky] at all times to liaise with Kulowiec Jorquera & Whalen LLP on your behalf and to accept instructions from and to provide advice to Kulowiec Jorquera & Whalen on your behalf." *See* Ex. 4 at Kulowiec323042-323067.

### G.      Top Jet's Fees Are Appropriate

Top Jet fully prevailed in its motion to compel and for sanctions. All documents were ordered produced, any privileges that existed were deemed waived and the Court ordered attorney's fees and costs. Therefore, all Top Jet's fees should be awarded. As this Court held, "litigation is not a game, and parties cannot engage in halfhearted or ineffective efforts to identify and produce relevant documents." Jan. 31 Order at 10.

As set forth in the Declaration of Carol Lee, Pillsbury's team members are appropriate, and their standard hourly rates are normal for New York firms. Top Jet negotiated steep, individualized discounts on Pillsbury's standard rates. The late-Eric Epstein's rate is discounted by 25%, Geoffrey Sant by 25%, Ed Flanders by 10%, Carol Lee by 32%, Michelle Ng by 31%, and Fangwei Wang by 27%. Lee Dec. ¶35; Ex. 20. Other attorneys and paralegals also had discounted rates ranging from 10% to 36%. *Id*. Indeed, *every* attorney working for Top Jet bills at a discounted rate. These discounts now benefit Kulowiec. *Id.*

Pillsbury's fees compare favorably to the fees paid by Kulowiec's clients. As noted above, Kulowiec acted as a middleman for Sky to engage Forbes Hare in the Cayman Islands. Forbes Hare charged Sky (from whom this Court has ruled Kulowiec can seek contribution) $900 an hour in their *losing* bid to block the sale of Sky assets. Here, Top Jet is paying its core

team far less (after discounts) for Top Jet's *successful* bid to obtain documents which prove an extensive fraud to block execution of a $100 million judgment.

Notably, when *Mr. Schnitzer* sought legal fees in this dispute, he claimed a document review *alone* would cost $500,000 (an amount he later dropped to $205,000).

## III.   **ARGUMENT**

### A.   **Attorney's Fees, Which Are Mandatory, Are "the Mildest" Form of Sanction**

Kulowiec produced documents after the Motion to Compel was filed—and, indeed, after the motion was fully briefed. "Accordingly, an award of reasonable expenses and attorney's fees is mandatory under Rule 37(a)(5)(a)." Jan. 31 Order at 12.

Sanctions are mandatory "even if the discovering party ultimately obtains, through Herculean and expensive effort, the discovery to which it was entitled." *Fendi Adele v. Filene's Basement, Inc.*, No. 06 Civ. 244 RMB MHD, 2009 WL 855955, at *5 (S.D.N.Y. Mar. 24, 2009); *see also*, *e.g.*, *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp*., 602 F.2d 1062, 1068 (2d Cir. 1979) ("[P]laintiff's hopelessly belated compliance should not be accorded great weight. Any other conclusion would encourage dilatory tactics..."); *A.V.E.L.A., Inc. v. Est. of Monroe*, No. 12 Civ. 4828 KPF JCF, 2014 WL 715540, at *7 (S.D.N.Y. Feb. 24, 2014); *Disabled Patriots of Am. v. Niagara Grp. Hotels, LLC*, No. 07 Civ. 284S, 2008 WL 941712, at *3 (W.D.N.Y. Apr. 4, 2008); *Underdog Trucking, L.L.C.*, 273 F.R.D. at 377 (citing 7 Moore's Federal Practice, §37.23 (courtesy copy attached hereto as Ex.18)).

This Court described Kulowiec's efforts to block discovery as "a game" that he "further exacerbated" by "withholding documents that were not privileged" and through his "clearly inadequate," "halfhearted," and intentionally "ineffective" searches. Jan. 31 Order at 10.

Sanctions are mandatory regardless of whether Kulowiec acted in bad faith. *See, e.g.,*

*Borsanyi v. Huggins*, No. 17-CV-7266 CBA AKT, 2019 WL 4911188, at *6 (E.D.N.Y. Sept. 30, 2019). Fee reimbursement is an automatic "if-then" mandate of Rule 37. This Court has already determined that the few potential exceptions to the Rule "are not present to overcome granting the award." Jan. 31 Order at 12 (citing *Wager v. G4S Secure Integration, LLC*, 2021 WL 4434953, at *6 (S.D.N.Y. Sept. 24, 2021)). *See also Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 321-22 (S.D.N.Y. 2008) ("Sanctions are appropriate '[w]hen a party seeks to frustrate [discovery] by … preventing disclosure of facts essential to an adjudication on the merits.'").

Attorney's fees are considered "the mildest" form of sanctions. *Underdog Trucking,* 273 F.R.D. at 379. It merely puts the winning party back in its financial position status quo ante. In the present case, Top Jet spent $916,848.81 to obtain documents to which it is legally entitled. Requiring the losing party to pay these fees does nothing more than put the winning party back in the position it was before the dispute.

"The great operative principle of Rule 37(a)(5) is that the loser pays." 8B Wright & Miller, Federal Practice and Procedure § 2288 (3d ed. 2010). Because this Court has granted Top Jet 100% of the relief requested, Rule 37(a)(5) mandates making Top Jet whole for its fees.

**B.    <u>Fees Negotiated and Billed at Arm's Length Are Reasonable</u>**

Top Jet seeks the actual amount of legal fees it incurred in litigating the subpoena and the resultant motion to compel and for sanctions. Lee Dec. ___. These fees were thus reasonable.

Courts hold that "the best guarantee of reasonableness is willingness to pay." *Balcor Real Estate v. Walentas-Phoenix Corp.*, 73 F.3d 150, 153 (7th Cir. 1996); *see also Matthews v. Wis. Energy Corp.*, 642 F.3d 565, 572-73 (7th Cir. 2011) ("willingness to pay is an indication of commercial reasonableness"). Here, Top Jet seeks the amount actually incurred and billed, which incorporates the large, individualized discounts Top Jet negotiated for each member of its core legal team. Top Jet's individualized discounts for the six attorneys who billed the most time to

this matter range from 14% to 32%. The median discount of these attorneys is 25%. Given Top

Jet's carefully tailored individualized discounts, which also represent the maximum discounts

Pillsbury would accept in an arm's-length negotiation, this Court should decline to modify these

rates and amounts. The rates are especially reasonable given that Kulowiec's client (Sky) has

been paying its own attorneys $900/hour to fight Top Jet's efforts to enforce its judgment.

Courts regularly find that fee arrangements negotiated at arm's-length between a client

and its law firm are necessarily reasonable: "A law firm is a business, and like any business its

charges must be commercially reasonable or its client base will dry up." *Armament*, *Sys. &*

*Procedures, Inc. v. IQ H.K. Ltd.*, 546 F.Supp.2d 646, 649-50 (E.D.Wis. 2008). "[I]t is not the

function of judges in fee litigation to determine the equivalent of the medieval just price,"

replacing fees actually negotiated with an ideal fee. *Matter of Cont'l Illinois Sec. Litig.*, 962 F.2d

566, 568 (7th Cir. 1992). As Justice Kagan explained for a unanimous Supreme Court, "trial

courts need not, and indeed should not, become green-eyeshade accountants." *Fox v. Vice*, 563

U.S. 826, 838 (2011). The injured party must be relieved of "expenses attributable" to the

improper conduct of the party that "acted wrongly." *Id.* at 834.

Unlike statutory fee-shifting principles used in civil rights litigation, a "successful Rule

37 motion" is intended to "simply [make] the [winning party] whole." *In re Terrorist Attacks*,

2015 WL 6666703, at *18 (citing *On Time Aviation, Inc. v. Bombardier Capital, Inc*., 354 F.

App'x 448, 452 (2d Cir. 2009) (approving higher out-of-district rates because "the reasoning

behind the calculation of awards under fee-shifting statutes... is not... precisely analogous to that

applicable to Rule 11 awards," the intent of which is not compensation of victims, but the

"curbing of abuses.")); *Ceglia v.. Zuckerberg*, No. 10–CV–00569A (LF), 2012 WL 503810

(W.D.N.Y. Feb. 12, 2012) ("Plaintiff's arguments proffered in opposition to Defendants' use of

out-of-district hourly rates... fail to perceive any distinction between attorney's fees awarded pursuant to a fee-shifting statute, and attorney's fees awarded as a sanction.")).

Generally, a court "is reluctant to second-guess counsel's time allocation for what has proved to be a winning case." *Fla. Rock Indus. v. United States*, 9 Cl.Ct. 285, 288 (1985) *cited in First Fed. Sav. & Loan Ass'n of Rochester v. United States*, 88 Fed. Cl. 572, 585 (2009) ("How experienced trial counsel staffs his or her case reflects counsel's professional judgment as to which the Court recognizes substantial leeway."); *see also Fox*, 563 U.S. at 838 ("We emphasize, as we have before, that a determination of fees 'should not result in a second major litigation.'") (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). Instead, courts simply refund the money that the winning party would not have incurred "but for" the losing party's conduct. *Dickinson Frozen Foods, Inc. v. FPS Food Process Sols. Corp*., No. 1:17-CV-00519-DCN, 2021 WL 2444157, at *12 (D. Idaho June 15, 2021) ("The Court will thus award [the winning party] the costs it would not have incurred but for [the losing party's] discovery misconduct, including the costs of travel and computerized legal research.").

In this case, Top Jet reasonably pursued this litigation because it has a $100 million judgment that it cannot enforce without obtaining ownership information from Sky. Moreover, Top Jet knows from the experience of its affiliate that Kulowiec's previous failures to comply with discovery caused a half-decade of litigation and tens of millions of dollars in legal fees to all parties. Given this, Top Jet's actual legal fees of $916,848.81 in pursuing this action are reasonable. Top Jet's legal fees are less than 1% of its $100 million judgment against Kulowiec's clients. Indeed, Top Jet's legal fees here are less than *the interest* that has accumulated on the judgment during the past 10 months litigating this discovery dispute with Kulowiec.

Nor can Kulowiec accuse Top Jet of running up fees while expecting reimbursement. A potential motion for sanctions and to compel was first raised during the September 9, 2021 hearing, more than four months into this dispute. *See* 9/9/2021 Hr. Tr. at 24:14-21 (THE COURT: "So, look, do you want to move to compel production and move for sanctions, because I can, we can have a formal briefing on that[.] Because I'm very concerned about this process, I'm very concerned about what Mr. Kulowiec has produced and I'm very concerned about the manner in which the search has been done. So do you want to file a formal motion . . . against Mr. Kulowiec?"); *id*. at 25:4-6 (THE COURT: "So do you want to move to compel and for sanctions for failure to comply with the subpoena, the document subpoena?"); *id*. at 28:2-3 (the Court warning Kulowiec that "you could be facing a motion to compel and possible sanctions").

Even after this Court granted leave to file this miscellaneous action, Top Jet *twice* obtained an extension of time to file while Top Jet attempted to continue negotiations with Kulowiec's counsel. *See* Related Case, Dkt. Nos. 37, 43.

Moreover, Kulowiec's mandatory obligation to pay Top Jet's attorney fees under Rule 37 was triggered by Kulowiec himself, by tactically withholding documents until the motion to compel was filed. Kulowiec cannot seriously allege that Top Jet had any expectation that Kulowiec himself would act in a way that triggered mandatory reimbursement of Top Jet's fees.

Rule 37 correctly mandates that the victim of discovery abuse should not be stuck with the bill. All of Top Jet's fees resulting from this motion are thus reasonable.

### C.   <u>Mr. Schnitzer Should Support Any Assertions As To His Own Fees</u>

Mr. Schnitzer previously asserted that $500,000 would be a reasonable amount of fees just for a document review. To the extent Mr. Schnitzer intends to argue that Top Jet's fees should be reduced because Kulowiec's own fees are lower, he should produce full invoices from

himself, the Bonuzzi firm, and Polsinelli to prove these assertions. Sky's litigation counsel, Polsinelli, attended and argued at hearings, submitted letters, participated in calls, and reviewed proposed productions. Any comparison of fees must also include Polsinelli's records. *See In re GMC*, 110 F.3d 1003, 1033 (4th Cir. 1997) (failure to produce billing records is "a concession" that opposing counsel's "efforts actually were reasonable").

Moreover, Mr. Schnitzer was not engaged until late June. During the first two months of this dispute, Kulowiec represented himself. Mr. Schnitzer's invoices would thus necessarily be lower than Top Jet's, given the extensive meet-and-confer attempts Top Jet made before Mr. Schnitzer's engagement. Kulowiec's own time should also be added into any comparison.

If Mr. Schnitzer produces his invoices, this Court should also take notice of whether they show any significant time spent reviewing documents prior to the September 9, 2021 hearing. This is when he made his "affirmative representation" to the Court. Rule 37 mandates attorney's fees but does not limit the Court's other inherent sanctioning powers for attorney misconduct.

D.   **Kulowiec's Misconduct and Choices Caused Top Jet's Fees**

Finally, in recognition that Top Jet will not have the opportunity to present a Reply brief, Top Jet notes that a defendant cannot contest the fees it caused through its own litigation choices and misconduct. Thus, a defendant who vigorously litigated "is in no position to complain that it induced [plaintiff] to incur *large* legal costs." *Balcor*, 73 F.3d at 153 (original emphasis).

When litigation expenses were "caused by… misdeeds," the "Court need not directly address the reasonableness of the outside counsel's bills." *GMC*, 110 F.3d at 1017. If the fees were caused by misconduct, then "the calculation will be relatively simple: what did [the injured party] pay…?" *Id.*; *see also*, *e.g.*, *Farmers Co-op Co. v. Senske & Son Transfer Co.*, 572 F.3d 492, 500 (8th Cir. 2009) (reimbursing 110% of plaintiff's fees because of discovery misconduct).

Here, this Court compared Kulowiec's "halfhearted" and "ineffective" discovery

responses to "a game." Jan. 31 Order at 10. "Defendant's initial search was clearly inadequate, as it did not involve search of all sources of relevant documents or search terms reasonably designed to locate relevant documents." *Id*. Kulowiec intentionally used search terms that were designed to fail "when there were other search terms he could have used." *Id*. He "further exacerbated the issues by withholding documents that were not privileged." *Id*.

The Court described "Defendant's non-compliance with the subpoena" (*id*., 2), "fail[ure] to search other files and…[his] missing documents" (*id*., 5), "lateness in responding to the subpoena," "failures… to conduct an appropriate search," "withholding of documents as privileged and then withdrawing privilege assertions," "failure to produce full email chains that should exist" (*id*., 6), and his "failing to conduct a reasonable search for documents in the first place" (*id*., 10). "[I]t is clear Defendant caused the instant dispute." *Id*. at 10.

Kulowiec therefore cannot dispute fees that he caused through his misconduct.

Finally, Top Jet has prepared exhibits providing detailed information about each individual who billed time to Top Jet on this matter, as well as a bullet-point list of the major items of work Top Jet's counsel performed over the course of this discovery dispute.  *See* Ex. 26.

## IV.   **CONCLUSION**

Top Jet respectfully requests that this Court require Kulowiec to pay fees, costs, statutory interest of 9% per annum (N. Y. Civ. Prac. L. & R. §§5003, 5004) from the date of each invoice, and other expenses resulting from this motion sufficient to put Top Jet into its status quo ante position. Neither Top Jet nor its counsel should bear the financial burden for Kulowiec's misconduct. Top Jet further requests such other relief as this Court deems just and proper.

New York, New York
Dated: February 11, 2022

Respectfully submitted,

PILLSBURY WINTHROP SHAW
PITTMAN LLP

By: */s/ Geoffrey Sant*
Geoffrey Sant
Ed Flanders
Carol Lee
Michelle Ng
31 W. 52nd Street
New York, New York 10019-6131
Telephone: 212-858-1000
Facsimile: 212-858-1500

Counsel for Plaintiff / Judgment-Creditor
Top Jet Enterprises, Ltd.